IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

BRENT JACOBY, #291 560,      )
                                  )
    Jacoby,                  )
                                    )
    v.                      )     CIVIL ACTION NO. 2:15-CV-382-MHT
                                    )              [WO]
WARDEN KARLA JONES, *et al.*,    )
                                    )
    Defendants.            )

## RECOMMENDATION OF THE MAGISTRATE JUDGE

Plaintiff Brent Jacoby, an inmate in the custody of the Alabama Department of Corrections ["ADOC"], files this *pro se* 42 U.S.C. § 1983 action alleging prison officials at the Ventress Correctional Facility ["Ventress"] are liable for constitutional claims arising from an incident which occurred at the facility on or about May 4, 2015.[1] Jacoby brings suit against Warden Karla Jones, Jimmy Thomas, Camelia Cagle, Elija Rouse, Corey Anglin, Michael Glenn, Saterro Hardy, Aellis Howard, Officer Ross, Janaris Jackson, and Isham Thomas. Jacoby requests trial by jury and seeks injunctive relief and damages. Doc. 21.

Defendants filed an answer, special report, supplemental special report, and supporting evidentiary materials addressing Jacoby's claims for relief. Docs. 29, 62. In these filings, Defendants deny they acted in violation of Jacoby's constitutional rights. *Id.* Upon receipt of Defendants' special report the court issued an order directing Jacoby to file a response, including sworn affidavits and other evidentiary materials, and specifically cautioning Jacoby that "the court may at any time thereafter and without notice to the parties (1) treat the special report and any

---

[1] In accordance with the prior proceedings and orders entered, this matter is before the court on Jacoby's second amended complaint. Doc. 21.

supporting evidentiary materials as a motion for summary judgment." Doc. 31 at 2; *see also* Doc. 55. Jacoby responded to Defendants' special report filed October 22, 2015, by filing a response titled "Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment." Doc. 47. The response is not sworn to by Jacoby for the truthfulness of the statements he makes and, thus, does not meet the requirements of FED. R. CIV. P. 56 (e)(1) (requiring that an affidavit "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated . . . "). This failure on Jacoby's part means that the court cannot, and did not, consider this response in opposition to Defendants' motion for summary judgment and is not evidence that could be deemed to create a genuine issue of material fact. See FED.R.CIV.P. 56(e)(1); *Holloman v. Jacksonville Housing Authority*, 2007 WL 245555, *2 (11th Cir. Jan. 30, 2007) ("unsworn statements, even from *pro se* parties, should not be considered in determining the propriety of summary judgment"); *Pfeil v. Rogers*, 757 F.2d 850, 859 (7th Cir. 1986); *Dickinson v. Wainwright*, 626 F.2d 1184, 1185 (5th Cir.1980).[2] To the extent affidavits or evidentiary submissions attached to Jacoby's unsworn opposition do meet the requirements of Rule 56(e)(1) (*see* Doc. 47-5), the court has considered them but finds they not demonstrate there is any genuine issue of material fact. *See* Doc. 31 at 2.  Jacoby filed no response to Defendants' supplemental special report. *See* Docs. 55, 62.  The court will treat Defendants' report, as supplemented, as a motion for summary judgment, and resolve this motion in favor of Defendants.

---

[2] The Eleventh Circuit in *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc ), adopted as binding precedent of the decisions of the former Fifth Circuit rendered prior to October 1, 1981.

# I. STANDARD OF REVIEW

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law." *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam); Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing the non-moving party has failed to present evidence to support some element on which it bears the ultimate burden of proof. *Id*. at 322−324.

Defendants have met their evidentiary burden. Thus, the burden shifts to Jacoby to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e)(3); *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593−594 (11th Cir. 1995) (holding that, once the moving party meets its burden, "the non-moving party must then go beyond the pleadings, and by its own affidavits [or sworn statements], or by depositions, answers to interrogatories, and admissions on file," demonstrate there is a genuine dispute of material fact) (internal quotations omitted). This court will also consider "specific facts" pled in a Jacoby's sworn complaint when considering his opposition to summary judgment. *Caldwell v. Warden, FCI*

*Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014).  A genuine dispute of material fact exists when the non-moving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263; *Allen v. Bd. of Public Educ.*, 495 F.3d 1306, 1313 (11th Cir. 2007).

Although factual inferences must be viewed in a light most favorable to the non- moving party and *pro se* complaints are entitled to liberal interpretation by the courts, a *pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine dispute of material fact. *See Beard v. Banks*, 548 U.S. 521, 525 (2006); *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). Jacoby's *pro se* status alone does not compel this court to disregard elementary principles of production and proof in a civil case.

## II. DISCUSSION

### A. Capacity to be Sued

In filing this action Jacoby seeks, in addition to injunctive relief, an "award of damages against Defendants in their official capacity for punitive and /or compensatory damages if applicable." Doc. 21 at 9.  Defendants correctly argue they are immune from monetary damages in their official capacities.  Doc. 29. While it is important for courts to "ensure that the defendants in question receive sufficient notice with respect to the capacity in which they are being sued," a plaintiff is "not required to designate with specific words in the pleadings that they are bringing a claim against defendants in their individual or official capacities." *Young Apartments, Inc. v. Town of Jupiter, Florida*, 529 F.3d 1027, 1047 (11th Cir.2008).

Official capacity lawsuits are "in all respects other than name, . . . treated as a suit against the entity." *Kentucky v. Graham*, 473 U. S. 159, 166 (1985).  Where it is unclear whether a plaintiff is suing the state actor in his official or individual capacity, "the court must examine the nature of

he 

the plaintiff's claims, the relief sought, and the course of proceedings." *Biggs v. Meadows*, 66 F.3d 56, 61 (4th Cir. 1995); *see also Young Apartments, Inc.*, 529 F.3d at 1047(internal quotations and citations omitted) ("while it is clearly preferable that a plaintiff state explicitly in what capacity defendants are being sued, failure to do so is not fatal if the course of proceedings otherwise indicates that the defendant received sufficient notice").

Here, Jacoby's allegations concern the actions of Defendants towards him (and other inmates) indicative of a personal capacity suit. *Biggs,* 66 F.3d at 61. Defendants raise the affirmative defense of qualified immunity in their answer indicating their awareness of their potential individual liability. Qualified immunity is available only in a personal capacity suit. *Id*. Finally, as noted, Jacoby requests "punitive and compensatory damages if applicable." Since punitive damages are only available against individual defendants, such is also indicative of the capacity in which a defendant is sued. *Id*. Accordingly, for the purposes of this proceeding, the court addresses the claims lodged against Defendants in both their individual and official capacities.

## B. Absolute Immunity

Official capacity lawsuits are "in all respects other than name, . . . treated as a suit against the entity." *Kentucky v. Graham*, 473 U. S. 159, 166 (1985).  "A state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984), or Congress has abrogated the state's immunity, *see Seminole Tribe v. Florida*, [517 U.S. 44, 59], 116 S.Ct. 1114, 1125, 134 L.Ed.2d 252 (1996).  Alabama has not waived its Eleventh Amendment immunity, *see Carr v. City of Florence*, 916 F.2d 1521, 1525 (11th Cir. 1990) (citations omitted), and Congress has not abrogated Alabama's immunity.  Therefore, Alabama

state officials are immune from claims brought against them in their official capacities." *Lancaster v. Monroe County*, 116 F.3d 1419, 1429 (11th Cir. 1997).

In light of the foregoing, Defendants are state actors entitled to sovereign immunity under the Eleventh Amendment for claims seeking monetary damages from them in their official capacities. *Lancaster*, 116 F.3d at 1429; *Jackson v. Georgia Department of Transportation*, 16 F.3d 1573, 1575 (11th Cir. 1994); *Parker v. Williams*, 862 F.2d 1471 (11th Cir. 1989).

## C.  Injunctive Relief

Jacoby is no longer incarcerated at Ventress.  The transfer or release of a prisoner renders moot any claims for injunctive or declaratory relief.  *See County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979); *see also Cotterall v. Paul*, 755 F.2d 777, 780 (11th Cir. 1985) (past exposure to even illegal conduct does not in and of itself show a pending case or controversy regarding injunctive relief if unaccompanied by any continuing present injury or real and immediate threat of repeated injury).  As it is clear from the pleadings and records before the court that Jacoby is no longer incarcerated at Ventress his request for equitable relief is moot.

## D. Lack of Service on Defendant Ross

On September 11, 2015, the court entered an order procedure directing service of the amended complaint on Defendants and further directing that Defendants file an answer and written report to the amended complaint.  Doc. 22. Service on Officer Ross was attempted but has not been perfected because he was unknown at the address provided by Jacoby.  According to the docket, the envelope containing Officer Ross's copy of the amended complaint and the court's order of procedure was returned to the court marked "Return to sender; Not at this facility."

If a person has not been served, he is not a party to this lawsuit except in very unusual circumstances. During the proceedings in this case, the court repeatedly advised Jacoby it is his

responsibility to provide the court with a defendant's correct name and address for service, informed him that he must monitor the case to ensure that all defendants he named had been served, and cautioned him the failure to perfect service on a defendant would result in the named person not being considered a party to this case. Docs. 22, 39.  Jacoby filed no response to the court's order that he provide a correct name and/or service address for Defendant Ross. *See* Doc. 39.

The Federal Rules of Civil Procedure require that service must be made upon a defendant within 120 days after filing the operative complaint.  Fed. R. Civ. P. Rule 4(m).  If a defendant is not served within this time limit "the court— on motion or on its own after notice to the plaintiff —must dismiss the action without prejudice against that defendant or order that service be made within a specified time." *Id*.

The time allowed for effecting service of the complaint on Officer Ross expired in January of 2016.  The undersigned finds that there is nothing before this court which warrants an order granting any further extension of the time for service.  *See generally Horenkamp v. Van Winkle & Co.*, 402 F.3d 1129 (11th Cir. 2005).  Consequently, Jacoby's claims against Officer Ross are subject to dismissal without prejudice as service has not been perfected on this individual in accordance with applicable procedural rules.

## E. Deliberate Indifference

### 1. Qualified Immunity

Jacoby claims Defendants were deliberately indifferent to his safety by housing him in a harsh and unsafe environment and failing to protect him during a riot in a segregation dorm. Doc. 21 at 6–8. Defendants assert they are entitled to qualified immunity on Jacoby's claims against them in their individual capacities for monetary damages. Doc. 29 at 8–10.

Qualified immunity offers complete protection from civil damages for government officials sued in their individual capacities if their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity is not merely a defense against liability but rather immunity from suit, and the Supreme Court "repeatedly [has] stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009) (quotation marks and citations omitted). To receive qualified immunity, the public official must first prove he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). There is no dispute that Defendants here were acting within the course and scope of their discretionary authority when the incidents occurred. Jacoby must, therefore, allege facts that, when read in a light most favorable to him, show that Defendants are not entitled to qualified immunity. *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003).

To satisfy his burden, a plaintiff must show two things: (1) that a defendant committed a constitutional violation and (2) that the constitutional right a defendant violated was "clearly established." *Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1332 (11th Cir. 2004). "To be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right. In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, ___ U.S. ___, 132 S. Ct. 2088, 2093 (2012) (quotation marks and citations omitted). "Clearly established law" means (1) "a materially similar case has already been decided"; (2) "a broader, clearly established principle that should control the novel facts of the situation"; or (3) "the conduct involved in the

case may so obviously violate the constitution that prior case law is unnecessary." *Gaines v. Wardynski*, 871 F.3d 1203, 1208–09 (11th Cir. 2017) (quotation marks and citations omitted). The controlling authority is from "the United States Supreme Court, the Eleventh Circuit, or the highest court in the relevant state." See *id*. at 1209. "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quotation marks and citations omitted). The Eleventh Circuit "has stated many times that if case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Gaines*, 871 F.3d at 1210.  "Exact factual identity with the previously decided case is not required, but the unlawfulness of the conduct must be apparent from pre-existing law." *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011). If a plaintiff cannot establish both elements to satisfy his burden, the defendants are entitled to qualified immunity, and the court may analyze the elements "in whatever order is deemed most appropriate for the case." *Rehberg v. Paulk*, 611 F.3d 828, 839 (11th Cir. 2010) (*citing Pearson*, 555 U.S. at 241–42).

### 2. Unsafe Environment[3]

Jacoby states he was housed in a segregation dorm for thirty days in the spring of 2015—mid-April to mid-May.  During his time on lock up, Jacoby observed several inmate-on-inmate

---

[3] The court notes that additional allegations of constitutional violations presented in an opposition which were not affirmatively pled in the complaint are not considered. Under well-settled law, a plaintiff may not "amend" his complaint through his opposition by raising new claims. *See Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006) (rejecting a new basis for a pending claim raised during summary judgment proceedings); *Gilmour v. Gates, McDonald & Co*., 382 F.3d 1312, 1314 (11th Cir. 2004) (finding the Rules of Civil Procedure do "not afford plaintiffs with the opportunity to raise new claims at the summary judgment stage."). The court, therefore, addresses the claims against Defendants alleged in the amended complaint, and considers the facts alleged only to the extent that they support those claims. *See Chavis v. Clayton Cnty. Sch. Dist*., 300 F.3d 1288, 1291 n. 4 (11th Cir. 2002) (refusing to address a new theory raised during summary judgment because the plaintiff had not amended the complaint).

assaults and claims the violent atmosphere arose from inmates being housed in segregation for one to two months "for no reason" or for due process violations during which time they had no access to paperwork and were not allowed to buy stamps, paper, pens, envelopes, or hygiene. Additionally, inmates on segregation had various privileges suspended including use of the phone, visitation, attendance at church services, and recreation. Jacoby maintains that due to these conditions—described by him as Defendants' deliberate indifference towards him and the other inmates in restricted housing—a week-long riot broke out on May 2, 2015, and on the third day— May 4, 2015— he was violently assaulted.  Doc. 21 at 6–7.

Defendant Jones states that on April 23, 2015, Jacoby was moved from disciplinary segregation to B-Dorm. Dorm B-1 is a restricted housing dorm which houses inmates who violate administrative regulations. Inmates may also be moved to the restricted privileges dorm where they may serve the remainder of their segregation time.  Dormitory B has four restricted housing cells where an inmate can be placed by himself if needed. Jacoby was placed in such a cell (Dorm B1-34A) on April 23, 2015. Jacoby was housed in that cell and remained there for seventeen (17) days. On May 9, 2015, Jacoby was placed on suicide watch in the healthcare unit. On May 11, 2015, Jacoby was released from suicide watch to B-1 Dorm (B1-36A).[4] On May 18, 2015, Jacoby was moved to a general population dorm (D1-40B). Doc. 29-1 at 4–7; Doc. 62-1, Doc. 62-6 at 5–6.

Defendants' evidence reflects the restricted privilege dorm was established to isolate drug positive and disciplinary inmates from general inmate population, to reduce overcrowding from the segregation unit, and to provide a mechanism by which an inmate can gradually earn his way back into the General Population. Inmates housed in a restricted privileges dorm have various

---

[4] Although Defendant Jones states Jacoby was released from suicide watch on May 17, 2015, his inmate movement history reflects he was moved to B136A on May 11, 2015. Doc. 62-6 at 6.

privileges suspended including no television, no store, no phone, no visitation, and no physical access to the law library and chapel. They are not allowed in any other dorm nor may they visit with other inmates not assigned to the restricted privileges dorm.  Yard time is allowed daily for forty-five minutes in the restricted privileges dorm exercise area as weather permits. Doc. 29-1 at 4–7.

Only actions which deny inmates "the minimal civilized measure of life's necessities" are grave enough to establish constitutional violations. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). The Eighth Amendment proscribes those conditions of confinement which involve the wanton and unnecessary infliction of pain. *Id*. at 346. Specifically, it is concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Id*. at 348 (citation omitted). Prison conditions which may be "restrictive and even harsh, [ ] are part of the penalty that criminal offenders pay for their offenses against society" and, therefore, do not necessarily constitute cruel and unusual punishment within the meaning of the Eighth Amendment. *Id*. Conditions, however, may not be "barbarous" nor may they contravene society's "evolving standards of decency." *Id*. at 345-346. "[T]he Constitution does not mandate comfortable prisons. If prison conditions are merely restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society. Generally speaking, prison conditions rise to the level of an Eighth Amendment violation only when they involve the wanton and unnecessary infliction of pain." *Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004) (internal quotation marks and citations omitted). Although the Constitution "does not mandate comfortable prisons . . .  neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Rhodes*, 452 U.S. at 349). Thus, it is well-settled that the conditions under

which a prisoner is confined are subject to constitutional scrutiny. *Helling v. McKinney*, 509 U.S. 25 (1993).

A prison official has a duty under the Eight Amendment to "provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " *Farmer*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-527 (1984)); *Helling*, 509 U.S. at 31-32. For liability to attach, the challenged prison condition must be "extreme" and must pose "an unreasonable risk of serious damage to [the inmate's] future health." *Chandler v. Crosby*, 379 F.3d 1278, 1289-1290 (11th Cir. 2004). To demonstrate an Eighth Amendment violation regarding conditions of confinement, a prisoner must satisfy both an objective and a subjective inquiry. *Farmer*, 511 U.S. at 834. In *Farmer*, the Court identified the objective and subjective elements necessary to establish an Eighth Amendment violation. With respect to the requisite objective elements, an inmate must first show "an objectively substantial risk of serious harm . . . exist[ed]. Second, once it is established that the official is aware of this substantial risk, the official must react to this risk in an objectively unreasonable manner." *Marsh v. Butler Co. Ala.*, 268 F.3d 1014, 1028-1029 (11th Cir. 2001). As to the subjective elements, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. . . . The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.' . . . [A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 837-838; *Campbell v. Sikes*, 169 F.3d 1353, 1364 (11th Cir. 1999) ("Proof that the defendant should have perceived the risk, but did not, is insufficient."); *Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th

Cir. 1996) (same). The conduct at issue "must involve more than ordinary lack of due care for the prisoner's interests or safety. . . . It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

A prison official may likewise be held liable under the Eighth Amendment for acting with " 'deliberate indifference' " to an inmate's health or safety when the official knows that the inmate faces "a substantial risk of serious harm" and disregards that risk by failing to take reasonable measures to abate it. *Farmer*, 511 U.S. at 828.

> To be deliberately indifferent, Defendants must have been subjectively aware of the substantial risk of serious harm in order to have had a sufficiently culpable state of mind. *Farmer*, 511 U.S. at 834-38, 114 S.Ct. at 1977-80; *Wilson v. Seiter*, 501 U.S. 294, 299, 111 S.Ct. 2321, 2324-25, 115 L.Ed.2d 271 (1991).... Even assuming the existence of a serious risk of harm and legal causation, the prison official must be aware of specific facts from which an inference could be drawn that a substantial risk of serious harm exists – and the prison official must also "draw that inference. *Farmer*, 511 U.S. at 837, 114 S.Ct. at 1979.

*Carter v. Galloway*, 352 F.3d 1346, 1349 (11th 40 Cir. 2003) (quotation marks omitted). A defendant's subjective knowledge of the risk must be specific to that defendant because "imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference.... Each individual Defendant must be judged separately and on the basis of what that person [knew at the time of the incident]*." Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008). Moreover, "[t]he known risk of injury must be a strong likelihood, rather than a mere possibility before a [state official's] failure to act can constitute deliberate indifference." *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (citations and internal quotation marks omitted). Thus, "[m]erely negligent failure to protect an inmate from attack does not justify liability under section 1983." *Id.*

13

Jacoby states Defendants Jones and Thomas assigned inmates to the restricted privileges dorm for between thirty to sixty days because of due process violations or "for no reason" which made the inmates housed there—with its attendant restrictions—volatile, aggressive, and assaultive. Jacoby contends his exposure to such harsh conditions including witnessing assaults and "even getting them" violated his Eighth Amendment rights.  While Defendants affidavits are not helpful in resolving the issue regarding the conditions in B-1 Dorm, there is no evidence on the record that creates a genuine dispute whether any defendant knew Jacoby suffered inhumane conditions or that he suffered any harm as a result of his the conditions about which he complains. That inmates are exposed to the risk of violence from other prisoners does not in and of itself violate the Eighth Amendment. *Doe v. Welborn,* 110 F.3d 520, 524 (7th Cir. 1997) ("It is the reasonably preventable assault itself, rather than any fear of assault, that gives rise to a compensable claim under the Eighth Amendment.").

Here, Jacoby does not allege, and the record is devoid of evidence, that he or anyone else alerted prison officials to the alleged inhumane conditions in Dorm B1 and nothing on the record suggests any defendant knew of the conditions and disregarded the risks of Jacoby's exposure to them. Jacoby, therefore, has failed to produce evidence which shows that Defendants knew of an obvious risk of serious harm to him regarding the conditions about which he complains and disregarded that risk. *Farmer* 511 U.S. at 837–38 ("An official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for condemnation, cannot under our cases be condemned as the infliction of punishment."). The mere fact that the conditions described by Jacoby existed is insufficient to demonstrate a constitutional violation. Consequently, Defendants' are entitled to qualified immunity on Jacoby's claims challenging the conditions of confinement in the restricted dorm at Ventress.

### 3. Failure to Protect

Jacoby claims Defendants exhibited deliberate indifference to his safety and well-being while he was housed in the restricted privileges dorm when a week-long riot occurred in B1 Dorm in early May 2015 and on May 4, 2015, several inmates rioted for five hours during which time he was assaulted while Defendants stood by and watched "constant acts of violence and failed to protect [him] and other inmates." Jacoby states he suffered bruises and cuts to his face and arm, and has constant neck and back pain and vibrations in his neck and back. Doc. 21 at 6–8.

Defendant Jones testified that inmates did not engage in for five hours on May 4, 2015, without prison officials intervening and denies a week-long riot occurred. Warden Jones affirms appropriate action would be taken in the face of any such incident. Defendants' evidentiary material includes an incident report regarding the May 4, 2015, incident. This report reflects:

> On May 4, 2015 at approximately 8:45 pm, Officer Aellis Howard radioed for assistance in Dormitory B1. Sergeant Rouse, Officers Janaris Jackson, Corey Anglin, Jesse Stanford, Dennis Threats, and Isham Thomas responded to the code. Sergeant Rouse entered Dormitory B, and observed inmates Laury Weaver, Wl264087, Ray Phillip, W/201350, Steven Spann, Wl25 I 840, Gregory Gallihair, Wl259220, Daniel Davis, W/242304, Johnny Bolling, Wl258647, Patrick Farley, W/238917, Michael Ramsey, Wl261231 and Anthony King, Wl270163, standing in the lobby area. Sergeant Rouse also observed a desk turned right-side up against the door with a cooler on top of it obstructing the view of the dorm.
>
> Sergeant Rouse entered the dorm and instructed Officers Jackson, Howard, Stanford, Threats, and Thomas to spread out to assess the situation in the dorm. While speaking with inmates inside the dorm, Sergeant Rouse observed several inmates running from Dormitory Bl-side to B4-side. Sergeant Rouse, Officers Glenn and Stanford entered B4 side and observed several inmates from B1 side throwing chairs across the dormitory. As Sergeant Rouse, Officers Glenn and Stanford were escorting the Bl inmates from B4 side, inmate Ricnardo Baldwin, B/243394, pushed Officer Stanford across the desk and stated, "Don't fucking touch me!" Sergeant Rouse instructed inmate Baldwin and all inmates that were assigned to BI side to report back to BI. All inmates complied.
>
> Officer Anglin notified Sergeant Rouse that inmate Baldwin had an inmate-made knife holstered on the side of his hip area, during the altercation with Officer Stanford. No weapon was confiscated. Upon securing the door to Dorm BI,

Sergeant Rouse instructed the officers to remain in the lobby area until the situation was under control.

At approximately 8:49 pm, On-Call Duty Official, Captain Camelia Cargle, was notified of the incident. At approximately 9:00 pm, several inmates that are housed in Dormitory B1 began kicking the door. After repeatedly kicking the door, the door became unsecured. Sergeant Rouse advised all of the officers assisting to stay near the door to keep it secured. At approximately 9:30 pm, Warden Karla Jones entered Dormitory B. At approximately 9:33 pm, Captains Jimmy Thomas and Camelia Cargle entered Dormitory B.

At approximately 9:45 pm, Officer Hardy observed inmate Christopher Dutton, W/237084, in a physical altercation with several other inmates inside of the dormitory. Inmate Dutton was released from the dorm into the lobby area, and escorted to the health care unit by Sergeant Tawanda Rhymes. Sergeant Rouse discovered that inmates James Harlow, W/202546, Martaves Brown, B/283753, Bobby White, B/189895, Jamar McKinstry, B/203900, Saad Oliver, B/233442, Undray Gardner, B/263833, and Kelly Young, B/171611, were the inmates that entered B4 side, and were all suspects in physical altercations with the above mentioned inmates.

Inmates Dutton, Bolling, Ramsey, King, Farley, Gallihair, Weaver and Davis were reassigned to Dormitory F. Inmates Harlow, Brown, White, McKinstry, Oliver, Gardner, and Young remained in Dormitory BI, Restricted Privilege Dormitory pending disciplinary action for Fighting without a weapon, and Being in an unauthorized area. Inmate Baldwin remained in Dormitory Bl, pending disciplinary action for Assault on an Employee, and Being in an Unauthorized Area. (See attached body charts). No pictures were taken. At approximately 11:04 pm, Gwendolyn Mosley, Institutional Coordinator arrived at the facility. At approximately 11:53 pm, Richard Wallace, Investigation and Intelligence arrived at the facility.

Doc. 29-11; *see also* 29-2–9, 62-1–4.[5]

Here, Defendants deny they acted with either callous disregard or deliberate indifference to Jacoby's safety at the time of the incident. Defendants' testimony and evidentiary materials reflect Jacoby was not involved in the May 4, 2015, incident; they did not observe him being assaulted, they have any knowledge of him being assaulted during the incident, and he did not

---

[5] Although Defendants Glenn's and I. Thomas's affidavits reference September 16, 2015, as the date of the incident to which they responded in B Dorm, it is clear from their affidavits and supporting evidentiary material that they responded to the event which occurred on May 4, 2015.

receive a body chart assessment following the incident. The unrefuted evidence reflects that those inmates identified as having been involved in a physical altercation during the disturbance and required medical treatment received body charts shortly after the incident.  Docs. 29-2–29-14; Doc. 47-5.

Jacoby's medical records show he did not submit a request for medical care or attention following the May 4, 2015, disturbance. On May 9, 2015, he submitted sick call request in which he stated he had informed prison officials the prior week that he had been strung out on spice for about a year which caused him manic attacks and depressive episodes and he felt suicidal and needed medication. Medical personnel examined Jacoby on May 9, 2015, for his complaint of having suicidal thoughts. During the examination, medical staff noted Jacoby's multiple tattoos, a scar to his right forearm, and no signs of distress. Medical personnel did not note any additional injuries or complaints by Jacoby of having been assaulted on May 4, 2015. He was placed on suicide watch in the healthcare unit. In a sick call slip dated May 11, 2015, Jacoby stated he had been jumped on by several inmates on or about May 4, 2015, and received a cut on his arm, a bloody nose, and bruises to his eye, thigh, and neck. Jacoby was seen by medical staff on May 13, 2015, where he was examined for his complaints of pain to his right wrist and back of his neck which he stated began on May 4, 2015, after he was assaulted by inmates. No other injuries were noted.  An x-ray of his right wrist was ordered and he was given pain medication. On May 15, 2015, Jacoby received a body chart for having slipped in the shower. Medical personnel noted a half inch laceration to the left side of his face with slight swelling. Other than noting an old scratch to Jacoby's right forearm, medical personnel document no other injuries or complaints. Jacoby was seen by medical personnel on June 4, 2015, for his complaints of right arm numbness for a

week which felt like electric shocks going through his right side and vibrating. A notation was also made that Jacoby stated "he was jumped on last month."  Doc. 62-5.

As previously referenced, correctional officials may be held liable under the Eighth Amendment for acting with "deliberate indifference" to an inmate's safety when the official knows that the inmate faces "a substantial risk of serious harm" and with such knowledge disregards that risk by failing to take reasonable measures to abate it. *Farmer*, 511 U.S. at 828. "A prison official's duty under the Eighth Amendment is to ensure reasonable safety, a standard that incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions." *Id*. at 844-845. "It is not, however, every injury suffered by one inmate at the hands of another that translates into a constitutional liability for prison officials responsible for the victim's safety." *Id*. at 834. "Within [a prison's] volatile 'community,' prison administrators are to take all necessary steps to ensure the safety of . . .  the prison staff[ ] and administrative personnel. . . . They are under an obligation to take reasonable measures to guarantee the safety of the inmates" as well. *Hudson v. Palmer*, 468 U.S. 517, 526-527 (1984). The Eleventh Circuit has, however, "stress[ed] that a 'prison custodian is not the guarantor of a prisoner's safety. *Popham v. City of Talladega*, 908 F.2d 1561, 1564 (11th Cir. 1990)[.]" *Purcell ex rel. Estate of Morgan v. Toombs County, Ga.*, 400 F.3d 1313 (11th Cir. 2005). "Only '[a] prison official's deliberate indifference to a known, substantial risk of serious harm to an inmate violates the Eighth Amendment.' *Marsh v. Butler Cnty., Ala*., 268 F.3d 1014, 1028 (11th Cir. 2001) (en banc).' " *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014). "In order to state a § 1983 cause of action against prison officials based on a constitutional deprivation resulting from cruel and unusual punishment, there must be at least some allegation of a conscious or callous indifference to a prisoner's rights, thus raising the tort to a constitutional stature." *Williams v. Bennett*, 689 F.2d 1370, 1380 (11th Cir. 1982).

At this juncture, Jacoby is required to produce sufficient evidence demonstrating (1) an objectively substantial risk of serious harm; (2) subjective awareness of this risk on the part of the defendants; (3) the defendants responded to such risk in an objectively unreasonable manner; and (4) the actions/omissions of the defendants caused him to suffer injuries. *Farmer*, 511 U.S. at 837-838; *Marsh*, 268 F.3d 1028-1029; *Hale v. Tallapoosa County*, 50 F.3d 1579, 1582 (11th Cir. 1995). "The known risk of injury must be a strong likelihood, rather than a mere possibility before [an official's] failure to act can constitute deliberate indifference." *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (citations and internal quotations omitted); *Rich v. Bruce*, 129 F.3d 336, 339-340 (4th Cir. 1997) (Unless a prison official actually makes the inference that a substantial risk of serious harm exists and then disregards that risk, he does not act with deliberate indifference even though his actions violate prison regulations or can be described as stupid and lazy.). An inmate "normally proves actual knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety." *McGill v. Duckworth*, 944 F.2d 344, 349 (7th Cir. 1991); *overruled in part on other grounds by Farmer*, 511 U.S. 825. An "official's failure to alleviate a significant risk that he should have perceived but did not," does not constitute deliberate indifference. *Farmer*, 511 U.S. at 838.  The foregoing makes clear that mere negligence in providing protection to an inmate "does not justify liability under section 1983. . . ." *Brown*, 894 F.2d at 1537.

Here, Defendants' evidence reflects inmates in B1 Dorm engaged in a disturbance beginning at approximately 8:45 p.m. on May 4, 2015. No evidence exists that Defendants had prior knowledge that a disturbance would occur and conclusory statements that prison official knew the incident would happen are insufficient. *See* Doc. 47-5 at 7. When the incident began, the undisputed evidence shows Defendants and other correctional personnel responded to Dorm B1

and took measures to bring the disturbance under control while securing the inmates in their assigned dorms. The difficulty for Jacoby is that he has submitted no evidence to show Defendants' subjective awareness of a significant risk of harm with respect to May 4, 2015, incident about which he complains. *See* Doc. 47—47-5. The record is devoid of any evidence showing Defendants drew the necessary inference and thereafter ignored a risk to Jacoby's safety. Under the circumstances of this case, "to find the Defendants sufficiently culpable would unduly reduce awareness to a more objective standard, rather than the required subjective standard set by the Supreme Court." *Carter*, 352 F.3d at 1350. Consequently, Defendants are entitled to qualified immunity on this claim of deliberate indifference.

### 4. Failure to Intervene

To the extent the amended complaint can be construed to allege Defendants failed to immediately intervene when the inmate disturbance in Dorm B1 began and remained in the lobby of Dorm B after securing inmates in their assigned dorm while the inmates continued to riot, this claim likewise provides no basis for relief. When Defendant Howard radioed for assistance in Dorm B1, six correctional officers responded to assist in quelling the disturbance and engaged in efforts regain control of B1 Dorm. After all inmates had reported back to their assigned dorm and the door to the B1 Dorm was secured, officers were instructed to remain in the lobby until the situation was under control.[6] To the extent they did not interject themselves into a volatile situation where they would have been outnumbered by inmates and not equipped to handle does not amount to deliberate indifference. Correctional officials are "not required to risk their own welfare in order to protect [an inmate]. The Constitution imposes a standard of human decency, not super human

---

[6] While Jacoby claims guards stood by and watch inmates get assaulted, Defendants' evidence reflects that after correctional officers observed an inmate in a physical altercation with other inmates, they opened the door to B1 Dorm to let him out, and he was then escorted to the medical unit. Doc. 29-10.

courage." *Stubbs v. Dudley*, 849 F.2d 83, 86-87 (2d Cir. 1988); *Morris v. Ward*, 2007 WL 951433, *1 (W.D. Mich. 2007) (Eighth Amendment does not require a prison guard to intervene when intervention would place the guard in danger of physical harm); *Longoria v. Texas*, 473 F.3d 586, 594 (5th Cir. 2006) "[N]o rule of constitutional law requires unarmed officials to endanger their own safety in order to protect a prison inmate threatened with physical violence. The officers violated no 'clearly established' law by falling to intervene while unarmed."); *Prosser v. Ross*, 70 F.3d 1005, 1008 (8th Cir. 1995) (no constitutional duty to intervene if doing so would endanger guards' physical safety); *MacKay v. Farnsworth*, 48 F.3d 491, 493 (10th Cir. 1995) (prison officials did not act with deliberate indifference when, in accordance with prison policy, they called for additional staff before intervening in an inmate fight). Under the circumstances of this case, the court finds no callous indifference in the actions of Defendants and deems their response a reasonable one. Consequently, Defendants are entitled to qualified immunity on Jacoby's failure to intervene claim.

### III. CONCLUSION

In light of the foregoing, it is the RECOMMENDATION of the Magistrate Judge that:

1.  Defendants' motion for summary judgment (Docs. 29, 62) be GRANTED;

2.  This case be DISMISSED with prejudice;

3.  Judgment be ENTERED in favor of Defendants;

4.  Costs be taxed against Plaintiff.

It is further

ORDERED that **on or before August 13, 2018**, the parties may file objections. Any objections filed must specifically identify the factual findings and legal conclusions in the

Magistrate Judge's Recommendation to which the parties object.  Frivolous, conclusive or general objections will not be considered by the District Court.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar a party from a *de novo* determination by the District Court of factual findings and legal issues covered in the report and shall "waive the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions" except upon grounds of plain error if necessary in the interests of justice. 11th Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993);  *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

DONE on this 30th day of July, 2018.

/s/     Wallace Capel, Jr.
CHIEF UNITED STATES MAGISTRATE JUDGE